·LIVINGSTON, ADM'R. VS. COCHRAN, ET · AL.

1. ADMINISTRATION ;  *Confirmation of sale; what amounts to.*
   An order of the Probate Court directing an administrator to make a deed to lands sold under a previous order, is a virtual confirmation of the sale.
2. SAME : *Probate Judge not allowed to purchase at probate sales.*
   A Probate Judge should not be allowed to purchase lands at a sale ordered by himself.
3. BONA FIDE PURCHASER.
   The purchaser of the bid of a Probate Judge, with knowledge that he was Judge, and had made the order of sale, and purchased for his own benefit, is not an innocent purchaser.
4. SPECIFIC PERFORMANCE: *Party seeking must be blameless.*
   A party seeking the aid of chancery to compel specific performance of a contract for the sale of lands, must come with clean hands, and there must be no fraud or breach of trust in the sale.

Livingston, Adm'r, vs. Cochran et al.

5. DOWER: *Not barred by probate sale.*

A widow's dower in the lands of her deceased husband, is not affected by a probate sale of them for payment of his debts.

6. SAME: *When barred by limitation.*

While the heirs of a deceased husband are in possession of his lands, the statute of limitation does not run against the widow's claims for dower: Otherwise, where a purchaser is in possession holding adversely.

APPEAL from *Fulton* Circuit Court.

Hon. WM. BYERS, Circuit Judge.

*Henderson* and *Caruth*, for appellant.

*Rose*, contra.

ENGLISH CH. J. :

It appears that the original bill and exhibits in this case, filed in the Circuit Court of Fulton County, 15th of March, 1870, were destroyed, and at the March Term, 1871, by order of court, and waiver of notice by defendant, substituted.

The bill was filed by Thomas Cochran against Lorenza D. Bryant, as executor of Harrison Dunham, deceased, to correct an error in the description of one of three tracts of land sold by defendant under an order of the Probate Court of Fulton County, and to compel him to make a deed to plaintiff for the three tracts.

On their application the widow and heirs of Dunham were made defendants, and filed answers and cross-bills.

The Probate Court having revoked the letters of Bryant, and appointed W. T. Livingston, public administrator of Dunham, with the will annexed, he was substituted as defendant at the May Term, 1876, and answered the bill.

On the final hearing, upon the pleadings and evidence, the cross-bills of the widows and heirs of Dunham were dismissed, and a decree rendered in favor of Cochran, in accordance with the prayer of the bill, from which Livingston, administrator, and the widow and heirs of Dunham appealed.

It appears that Harrison Dunham made his will 2d March, 1857, by which he appointed Lorenzo D. Bryant, his executor; that he died sometime in the year 1858, and that his will was probated, and letters of executorship granted to Bryant at the May Term, 1858, by the Probate Court of Fulton County. The probate records having been destroyed, the probate of the will, and the grant of letters were proven by secondary evidence.

It also appears that Dunham owned at the time of his death the northeast quarter of section 10, southeast quarter of section 3, and the southwest quarter of northeast quarter section 3, in township 20 north, range 8 west; contiguous tracts, situated near Salem in Fulton County, which are the lands in controversy in this suit.

In November, 1859, Bryant, as executor of Dunham, applied to the Probate Court for an order to sell lands to pay debts, representing the personal property to have been exhausted, and it is reasonably certain from the pleadings and evidence in this suit, that he intended to apply for an order to sell the lands above described, and that they were in fact sold under the order of sale made by the court, and in the return of the sale they were described thus : Northeast quarter section 10, southeast quarter section 7, and southwest quarter of northeast quarter section 3, township 20 north, range 8 west— 360 acres.

The southeast quarter of section *seven* is not contiguous to the other two tracts, and the evidence conduces to show that it was not owned by Dunham, but that the southeast quarter of section *three* was owned by him, is contiguous to the two other tracts, and that its misdescription was a clerical error.

The lands were sold on the 16th December, 1859, on a credit of twelve months, for $390, and returned as purchased by S. W. Cochran; but it appears that he transferred his bid to

Thomas Cochran, the complainant in this suit, who gave his note for the purchase money, with Samuel W. Cochran and E. C. Hunter, as sureties, payable twelve months after the day of sale, with interest at ten per cent. from maturity, and took possession of the lands.

In the year 1866, the note not having been paid, Bryant, as executor of Dunham, sued Cochran upon it, and before judgment, he paid the debt and interest to Bryant's attorney, on a promise that a deed would be made to him for the lands. After payment he was informed that the above error in the description of one of the tracts had been discovered, and on subsequent application to the Probate Court, an order was made correcting the error, and directing Bryant, as executor of Dunham, to make him a deed, which he failed to do, and hence this suit was brought.

I. We think upon all of the facts and circumstances disclosed in the pleadings and evidence, appellee, Cochran, made a case for the correction of the error in the description of the tract of land in question, under repeated decisions of this court. *Stewart et al.* v. *Pettigrew*, 28 Ark., 373. *Blackburn et al.* v. *Randolph et al. MS.* The error, however, had been corrected by an order of the Probate Court, before the bill in this case was filed, as more particularly shown below.

II. It is submitted by counsel for appellants that the order of the Probate Court for the sale of the lands should be treated in this suit as null and void, because it is not made to appear that Bryant, as executor of Dunham, gave public notice of the intended application for the order of sale, as required by sec. 175, chap. 4, Gould's Digest, then in force.

The bill does not allege that the notice was given, nor does the answer and cross-bill of Dunham's heirs allege that it was not given, and the depositions are all silent on the subject.

It was certainly the duty of the executor to give notice as

required by the statute, and it was the duty of the Probate Court to see that the notice had been given before making the order of sale, and the granting of an order of sale without such notice would be an error and ground for reversal of the order on appeal. But when the order comes in question collaterally, as in this case, and not in a direct proceeding to review it, it cannot be treated as null and void because such notice is not shown to have been given, as repeatedly held by this court. *Rogers et al.* v. *Wilson et al.*, 13 Ark., 507 ; *Montgomery et al.* v. *Johnson et al.*, 31 Ib., 83 ; *Gwyn et al.* v. *McCauley et al.*, 32 Ark., 107 ; *Sturdy et al.* v. *Jacoway*, 19 Ib., 499.

III. It is objected by counsel for appellants, that the sale was not confirmed by the Probate Court.

It appears that the sale was made in accordance with the order of the court, as to time, place, terms, etc., and reported to the court by the executor. It is also shown that Enos G. Hunter, who was Probate Judge at the time the order of sale was made, and at the time the sale was reported, endorsed upon the return of the sale "*approved,*" and signed it officially. He also swears in his deposition that the sale was regularly made and reported, and approved by him as Probate Judge, etc. He was, however, a bidder at the sale, and speculated upon his bid, as will be shown below, and we are not disposed, on that account, to attach any value to his approval of the sale.

But it appears that before the burning of the court house, and the probate records, etc., and after appellee had paid his note for the purchase money of the lands, and after the error in the description of one of the tracts had been discovered, and after *Enos C. Hunter* had ceased to be Probate Judge, and another person had become presiding judge of the court, appellee filed a petition in the Probate Court to have the error

in the description of the land corrected, to which Bryant, executor of Dunham, appeared by his attorney, and the court, upon the evidence adduced, made an order of record at the May term, 1867, correcting the mistake, and directing the executor to make appellee a deed for the lands.

This order is not subject to the objection that the judge who made it was interested in the matter, and may be treated as a virtual confirmation of the sale. But the purpose of the application was to correct the mistake in the description of the land, and no other matter seems to have been inquired into or passed upon by the court. Whether there was fraud or unfairness in the sale does not appear to have been the subject of inquiry. The executor refused or neglected to make a deed under the order, and appellee had to resort to chancery for specific performance, and the court below was not precluded by the order, nor is this court thereby precluded, from enquiring whether there was fraud in the sale.

IV. In the answer and cross-bill of Dunham's heirs, it is alleged that the lands were worth at the time of the sale $1500; that Enos C. Hunter, the Judge of the Probate Court, Samuel W. Cochran, J. Shelby Shaver, and Lorenzo D. Bryant, executor of Dunham, in furtherance of a previous conspiracy (they being the principal land-buyers in the vicinity of Salem) procured the order of sale, and so planned that the lands were not appraised, in order that they might more effectually be sacrificed, and agreed and confederated not to bid against each other, Bryant to get the proceeds of sale, and the others to divide profits. That Hunter bid off the lands at the sale at the nominal sum of $390, and had the sale reported in the name of Samuel W. Cochran, and in furtherance of said scheme and conspiracy, Thomas Cochran, with full knowledge of said conspiracy, paid to Hunter, Samuel W. Cochran and Shaver, $100 each immediately after the sale, and executed his

note to the executor for the amount bid by Hunter for the the lands, with Samuel W. Cochran and Hunter as sureties.

It is also alleged that the personal property was sufficient to pay the debts of the estate, that they had in fact been paid at the time the order of sale was procured, and that there was no necessity for selling the lands to pay debts, but these allegations were denied, and not proven; nor was it proven that the order of sale was procured in pursuance of the alleged conspiracy to purchase the lands; and it was proven, by the deposition of Hunter, that the lands were appraised before the sale, and brought over two-thirds of their appraisment value.

It was proven by several depositions that after the lands were advertised, Hunter, Shaver and Samuel W. Cochran made an agreement to purchase them at the sale in partnership; that Shaver and Samuel W. Cochran failed to get to Salem until the sale was over; that Hunter, being the highest bidder, became the purchaser of the lands at the sum above stated, and that the lands were returned by the executor as sold to Samuel W. Cochran. That shortly after the sale, Thomas Cochran paid Hunter, Shaver and Samuel W. Cochran $100 each, profits on their purchase; the bid was traded to him, and he gave his note to the executor for the amount of Hunter's bid, with Samuel W. Cochran and Hunter as sureties.

Hunter states in his deposition that he thought the lands were worth more than he bid for them, or he would not have purchased them.

Appellee denies, and it was not proven, that he was a party to the agreement made between Hunter, Shaver and Samuel W. Cochran, to purchase the lands. He states that the lands sold for their full value at the sale, but ascertaining that he could trade them advantageously to John L. Miller for lands owned by him, he was induced on that account to advance to Hunter, Shaver and Samuel W. Cochran, $100 each upon their bid.

Livingston, Adm'r, vs. Cochran et al.

All of the witnesses who testified in relation to the value of the lands, except Hunter, deposed that the lands brought their full value at the sale.

A Probate Judge should not be permitted to purchase lands at a sale ordered by himself, for he might be tempted to order a sale to the prejudice of persons interested in the estate.

Moreover, it is his duty to see that the sale has been conducted fairly, and in accordance with law and the order of sale. When the land is sold upon credit, as in this case, it is incumbent on him to see that the sureties of the purchasers are responsible, and finally to confirm the sale if properly made, or to set it aside and order a re-sale, if illegal or improvidently made.

In this case the Probate Judge, who made the order of sale, entered into an agreeement with two other persons to purchase the lands on speculation ; he bid them off at the sale, and disguised his bid by causing the lands to be returned as sold to one of his partners, and he and his two partners soon after the sale sold the bid to appellee for a profit of $300, and he signed appellee's note as surety for the amount bid for the lands at the sale. He deposes that he approved the sale as Probate Judge. But he was not an impartial judge. He was interested in the sale. Had he disapproved the sale, set it aside, and ordered a re-sale, he and his partners would have been obliged to refund to the appellee the profit which they had made upon their bids. In approving the sale, he also passed upon his own solvency as a surety upon appellee's note for the purchase money, which was indelicate.

We quote with approbation, the following remarks of Lord Campbell, in *Dimes* v. *Grand Junction Canal*, 3 House of Lords Cases, 793, where a decree was held voidable because the Lord Chancellor, who was disqualified from interest, sat as judge in the cause : "I take exactly the same view of this

---

---

case as do my noble and learned friends, and I have very little to add to their observations. With respect to the point on which the learned judges were consulted, I must say that I entirely concur in the advice which they have given to your Lordships. No one can suppose that Lord Cottenham could be in the remotest degree influenced by the interest he had in this concern, but, my Lords, it is of the last importance that the maxim that no man is to be judge in his own cause, should be held sacred. And that is not to be confined to a cause in which he is a party, but applies to a cause in which he has an interest. Since I have had the honor to be Chief Justice of the Court of Queen's Bench, we have again and again set aside proceedings in inferior tribunals, because an individual, who had an interest in a cause, took part in the decision. And it will have a most salutary influence on these tribunals, when it is known that this high court of last resort, in a case in which the Lord Chancellor of England had an interest, considered that his decree was on that account a decree not according to law, and was set aside. This will be a lesson to all inferior tribunals to take care, not only that in their decrees they are not influenced by their personal interest, but to avoid the appearance of laboring under such an influence."

The Honorable Enos C. Hunter may have been as innocent of any wilful or intentional wrong in the matter now before us, as Lord Cottenham was in the case before the House of Lords, but as matter of law, and for example, we feel constrained to condemn his conduct.

In *Imboden* v. *Hunter*, 23 Ark., 622, Hunter, through another, purchased property at a trust sale, made by him as trustee, and a bill was brought to set aside the sale. Justice Compton, delivering the opinion of the court said: "It is a stern rule of equity, that a trustee to sell for others, is not allowed to purchase, either directly or indirectly for his own

benefit, at the sale. He cannot be both vendor and purchaser. As a vendor it is his duty to sell the property for the highest price, and as a purchaser it is his interest to get it for the lowest, and these relations are so essentially repugnant—so liable to excite a conflict between self-interest and integrity, that the law positively forbids that they shall be united in the same person. And it matters not, in the application of the rule, that the sale was *bona fide* and for a fair price. The inquiry is not, whether there was fraud in fact. In such a case the danger of yielding to the temptation is so imminent, and the security against discovery so great, that a court of equity, at the instance of the *cestui que trust*, if he applies in a reasonable time, will set aside the sale, as of course. The rule is not intended to remedy actual wrong, but is intended to prevent the possibility of it. The situation of the party, *itself*, works his disability to purchase. * * * * * The rule is not confined to persons who are trustees within the more limited and technical signification of the term, or to any particular class of fiduciaries, but applies to all persons placed in a situation of trust or confidence with reference to the subject of purchase. It embraces all who come within the principle; permitting no one to purchase property and hold it for his own benefit, when he has a duty to perform in relation to such property, which is inconsistent with the character of a purchaser on his own account and for his individual use."

All that is above said in relation to trustees purchasing at sales made by them, applies, on principle, to the case of a Probate Judge purchasing at a sale made upon his own order, and which he is obliged to have conducted fairly, and for the benefit of creditors, legatees or distributees of the estate.

Appellee traded for the bid of Hunter and his partners, paid them a profit of $300 upon it, and became the purchaser of the lands, by substitution, with a full knowledge that Hunter

was Probate Judge, that he made the order of sale, that he bid off the lands at the sale for the benefit of himself and his partners, and was speculating upon his bid. Appellee cannot be treated as an innocent purchaser.

Upon the above state of case, appellee applied to the court below, sitting in chancery, for specific performance of the sale—to compel the executor of Dunham to make him a deed for the lands so purchased; and against the protest of the heirs of Dunham, the relief which he prayed was granted; and we are asked to confirm that decree, and thereby sanction the misconduct of the Probate Judge.

A party seeking the aid of chancery to compel the specific performance of a contract for the sale of lands, must come into court with clean hands, and there must be no fraud or breach of trust in the sale. Bispham's Equity, sec. 372.

The appellee does not appear in court with clean hands. The conduct of the Probate Judge in relation to the sale was, in the eyes of the law, fraudulent, and involved a breach of public trust, and such a sale cannot be enforced for the benefit of appellee, who purchased his bid with the full knowledge of the facts.

It was an error in the court below to decree to appellee title to the lands, and so much of the decree must be reversed, and his bill dismissed.

V.   It appears that shortly after the probate sale, appellee sold the lands in controversy to John L. Miller, who went into possession of them, made valuable improvements on them, and continued in possession until after the institution of this suit, and died pending the suit, and before Dunham's heirs filed their cross-bill. One witness states that the improvements made by him were worth from $1200 to $1800.

The cross-bill of Dunham's heirs was filed on the 27th of April, 1875, over fifteen years after the probate sale.

It seems that Dunham left some heirs, sons and daughters, five of whom, with the husbands of the married females, joined as complainants in the cross-bill. It is alleged that one of the sons, William M., died in 1872, leaving Cynthia Dunham, his mother, his heir, and she joins in the cross-bill, claiming his share in the lands. One of the heirs, Adaline, is alleged to be a minor, and sues by Cynthia Dunham, her mother, as her next friend. Drucilla, one of the heirs, and her husband, John Richardson, did not join in the cross-bill; they were made defendants therein, but no process appears to have been issued against them, and their appearance was not entered.

The cross-bill, after alleging fraud in the probate sale of the lands as above shown, avers that John L. Miller died since the commencement of the suit in possession of the lands, and that John M. Chestnut, who became his administrator, permitted the lands to be sold for taxes in May, 1872, bought them in the name of Miller's heirs; and afterwards procured a Clerk's deed therefor in the name of said heirs. That Chestnut died, and R. R. P. Todd succeeded him in the administration of Miller's estate.

The cross-bill prays that Todd, as administrator of Miller, be made defendant, and required to bring into court said tax deed to be cancelled, that the probate sale of the lands be set aside, that an account of the rents and profits of the lands be taken, and decreed to complainants in the cross-bill, and that they have possession of the lands, etc. They do not offer to refund to appellee the purchase money he paid to Bryant, as executor of Dunham, for the lands, nor make the heirs of Miller defendants to the cross-bill.

Todd, as administrator of Miller, entered his appearance October the 1st, 1875, but filed no answer.

To his answer to the cross-bill, appellee added a demurrer.

The case was submitted at the May term, 1876, and the decree rendered at the November term following.

When the adult heirs of Dunham became of age, is not alleged in the cross-bill, nor shown by the depositions.

What the rights of Miller's heirs may be in the premises as against the cross-complaints, the court below could not adjudicate, nor can we, on this appeal, because they were not made defendants.

Whether the application of the cross-complainants, or such as were adults, to set aside the probate sale for fraud, was made in apt time, or whether their remedy was barred by limitation, we cannot determine upon the pleadings and evidence before us.

So much of the decree of the court below as dismisses the cross-bill of Dunham's heirs, must therefore be affirmed, with the modification that it be dismissed without prejudice.

VI. On the 8th of May, 1876, Cynthia Dunham, widow of Harrison Dunham, filed a cross-bill claiming dower in the lands in controversy, alleging that no provision was made for her by the will of her deceased husband, that she had not assented thereto, that she had not relinquished dower in the lands, and that dower had not been assigned to her. She makes no defendants to her cross-bill for dower, and none of the parties appear to have answered it.

Her right of dower was not affected by the probate sale of the lands, by the executor, to pay the debts of her deceased husband.

Had there been no sale of the lands, and had the heirs of Dunham remained in possession of them after his death, the statute of limitations would not have run against her in their favor, because it would have been their duty to assign her dower in the lands. But shortly after appellee purchased the lands at the probate sale, he sold them to John L. Miller (by

exchange for other lands) who entered upon and improved them, and it appears held them adversely for the full period of limitation before she filed her cross-bill claiming dower in the lands, and Miller's heirs were not made defendants to her cross-bill.

Her right of dower appears to have been barred by limitation, and for that reason, perhaps, the court below dismissed her cross-bill. See *Danley* v. *Danley* et al., 22 Ark., 263; *Stedham and Wife* v. *Matthews* et al., 29 Ark., 660.

So much of the decree of the court below as dismisses her cross-bill for dower is affirmed, with a modification that the dismissal be without prejudice.